UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS LEWIS,

     Petitioner,                         Case Number 12-CV-13819

                                             Honorable Patrick J. Duggan

CINDI CURTIN,

     Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, GRANTING IN PART AND DENYING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

## I. INTRODUCTION

This matter is presently before the Court on Petitioner Curtis Lewis's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254 on August 29, 2012. On August 18, 2009, following a jury trial in the Jackson County Circuit Court, Petitioner was convicted of armed robbery. Petitioner was sentenced to 15-to-20 years in prison. The petition raises the following claims: (1) trial counsel was ineffective for failing to move to suppress Petitioner's coerced confession; (2) trial counsel was ineffective for failing to object to jury instructions regarding appropriate police tactics during the interview of a suspect; (3) Petitioner's sentence is invalid because the minimum term exceeds two-thirds of the maximum term; and (4) Petitioner's sentence should be

amended to reflect the withdrawal of the habitual offender status.[1] The Court finds that all of Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will, however, grant Petitioner a certificate of appealability with respect to claim (1), but deny a certificate of appealability with respect to his remaining claims. The Court will also grant Petitioner permission to proceed on appeal in forma pauperis.

## II.  FACTS AND PROCEDURAL HISTORY

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant was convicted of robbing a payday advance store, the Check 'N Go, in the City of Jackson. Check 'N Go employee Ashley Sanders testified that she was working at the store on April 13, 2009. At approximately 5:00 p.m., a man entered the store, pulled a bandana over his face, walked behind the counter, stated that it was a hold-up, and demanded that Sanders and a coworker get down on the ground. Sanders believed that the robber had a gun because as he came behind the counter he stated, '"[t]his is not a f**** joke, this is a . . . hold up . . . I will pull my pistol out."' She further testified that the robber "kind of had his hand in his pocket and he—it was kind of like, you know, I'm not sure if it was a finger or if it was a gun, but it looked like a gun." The robber was wearing a grey hooded sweatshirt and white tennis shoes.

---

[1] After reviewing Petitioner's habeas petition, Respondent's response thereto, and the Rule 5 materials submitted in this case, the Court appointed counsel to represent Petitioner in this matter and ordered supplemental briefing regarding claim (1) of the petition.

There were three cash drawers behind the counter. After unsuccessfully attempting to open another drawer, defendant went to the case drawer of Sanders's coworker, Wendy Alexander. According to Sanders, Alexander advised defendant that her drawer had to be opened in a different manner, and Alexander offered to open the drawer for defendant. The robber responded by stating, "[y]ou have three seconds to open the f**** drawer or else I'm going to blow your head off, bitch."

Sanders testified that the robber demanded to know where the rest of the money was, and she and Alexander told him it was in the safe. The robber took the safe bag, and then began walking out while telling the women to stay down for thirty seconds '"or else I'm going to blow this bitch up if you guys get up."' Sanders took this statement to mean that the robber was going to shoot the place up, not blow it up with a bomb.

Sanders testified that a young man had come into the store earlier in the day that looked similar to the robber, i.e., "same body type, same build, everything." He was with a new female customer, who listed defendant as one of the references for her loan application. Sanders stated that the man, who was wearing a grey hooded sweatshirt with a jersey over it and white tennis shoes, seemed to be watching everything that she and her coworkers were doing. n1

> n1 Alexander gave a similar account of the robbery and added that after the robbery she and the district manager for Check 'N Go were able to determine that approximately $3,100 was taken by the robber.

Brenda Wyman, Alexander's mother, approached the store just as Alexander and Sanders were standing up to call 9-1-1. Wyman testified that as she approached the Check 'N Go, she saw a man attempting to run as he left the store, but that he "was being slowed down by something heavy or awkward in his right side pockets." The man was wearing a light-colored, possibly light grey, hooded sweatshirt.

Jackson Police Department Detective Ed Smith testified that he went to defendant's residence and, after conducting a search, seized a grey hooded sweatshirt, khaki pants, white tennis shoes and a jersey with the

same number as the robber was seen wearing in the surveillance video from the Check 'N Go. Sanders and Alexander identified the sweatshirt and shoes as consistent with those worn by the robber, and also identified the jersey as the one the young male customer had been wearing earlier in the day. Wyman testified that the sweatshirt admitted into evidence had the same basic style and color as the one worn by the man she saw leaving the store. n2

> n2 Sanders, Alexander and Wyman each testified that defendant looked like the young man who came into the store before the robbery, while Alexander and Sanders said that defendant also had the same size, build, and complexion as the robber.

Smith testified that defendant willingly came to the police station for an interview. Before the interview, which was held approximately ten days after the robbery, Smith advised defendant that he was not under arrest. According to Smith, he and another officer, Detective Serg Garcia, decided to minimize the crime when speaking with defendant. At first, defendant denied knowing anything about the robbery although he admitted being at the Check 'N Go earlier in the day. Smith pressed defendant about his activities on the day in question, and then began trying to get defendant to express some sympathy or empathy for the robber by suggesting that, given the troubled economy, somebody might understandably resort to robbery in order to take care of their family. Smith also pressed defendant on some inconsistencies between his story and the story of some of the people he had gone with to the Check 'N Go. Smith also suggested to defendant that the two of them needed "to work together to minimize this" and that he did not want defendant to be locked up. Smith stated, "[T]hey're trying to charge you with armed robbery with a gun, okay? I don't think that's what happened, okay." Smith also stated that if defendant confessed, he could make the case go away, but defendant still denied involvement. n3

> n3 Smith admitted lying to defendant about the evidence he had against him, and about his ability to make the case go away. Smith also admitted that defendant told him that he (defendant) had only had a couple of hours of sleep the

-4-

> night before the interview. At trial, defense counsel argued that defendant had falsely confessed because of the coercive environment during the interrogation, but never actually attempted to have the confession suppressed.

As the interview continued, Smith told defendant that Check 'N Go simply wanted its money back and asked defendant if he would be willing to pay restitution, to which defendant stated that he would. Detective Garcia then joined Detective Smith in the interview room. Garcia continued to try to minimize the crime, saying that no one was trying to convict defendant of robbery, and also stated that he did not want the "girls" that defendant had gone with to the store earlier in the day to get locked up. Garcia continued to press the restitution issue, asking defendant how much restitution might be owed. Defendant told Garcia "eight hundred," a number that Smith had tossed out earlier in the interview when trying to elicit how much restitution defendant could afford to pay. Garcia proceeded to ask whether this was going to happen again, whether defendant had robbed anyplace else, whether defendant had a gun, and whether defendant had gotten physical with the store employees—all of which defendant denied. When asked "you stole their money at best," defendant answered "[t]hat's it." From that point on in the interview, defendant continued to answer questions premised on the fact that he had admitted to the robbery. As the interview continued, defendant indicated that the women at the store may have believed he had a gun because of how he was holding his hand, and he told the detectives the robbery was not planned.

Following the conclusion of the recorded interview, Smith spoke with the prosecutor's office and formally arrested defendant. Defendant was then advised of his *Miranda* n4 rights and re-interviewed, whereupon defendant fully admitted to the robbery. However, this second interview was not recorded because, according to Smith's testimony, the batteries for his recording device had died, which Smith did not realize at the time.

    n4 *Miranda v. Arizona*, 384 U.S. 436 (1966).

During voir dire, both defense counsel and the prosecutor questioned the

jurors as to how it might affect their decision-making if they learned the police had lied to someone while interrogating a suspect. While the prosecutor was pursuing this line of questions, the trial court intervened:

THE COURT: Mr. Mehalco [the prosecutor], wait. I think Mr. Gaecke's [defense counsel] referenced it, now Mr. Mehalco is, and I guess I would instruct the jury that—that there are certain levels of permissible deception that the police can use when they're interviewing a suspect in a crime. Ultimately, if an admission comes in the court has to be satisfied that it was made knowingly, intelligently and voluntarily, so you know, I just wanted to instruct the jury of that.

I mean, there could—(undecipherable)—a situation that there's so much over-reaching police misconduct that as a matter of law the court wouldn't even let the admission and/or confession in, so I just wanted to make sure that—that all of you understand that a certain amount of that is allowed.

Now, what—what significance you want to attach to that is up to the jury. Do all of you understand that? All right, so okay.

As noted, the jury found defendant guilty of armed robbery.

*People v. Lewis*, 2011 Mich. App. LEXIS 353, at *1-8 (Mich. Ct. App. Feb. 17, 2011)

Following his conviction and sentence, Petitioner filed an appeal with the Michigan Court of Appeals, raising what now forms his habeas claims. The court affirmed his conviction, but remanded the case for resentencing. *Id.* Both parties appealed to the Michigan Supreme Court, and the Court ordered Petitioner's original sentence reinstated and denied Petitioner leave to appeal the issues he was appealing. *People v. Lewis*, 489 Mich. 941 (2011) (table).

### III. LEGAL STANDARD

-6-

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409, 120 S. Ct. at 1521. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11, 120 S. Ct. at 1522.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 2066 n.7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not

completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5, 99 S. Ct. 2781, 2796 n.5 (1979) (Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## IV. ANALYSIS

### A. Ineffective Assistance of Counsel

Petitioner's first claim asserts that his trial counsel was ineffective for failing to move to suppress Petitioner's statement to police on the grounds that it was involuntarily given. Petitioner's second claim asserts that his counsel should have objected to a jury instruction regarding the interview technique employed by the police officers.

In order to prevail on a claim of ineffective assistance of counsel, Petitioner "must show both that his counsel's performance was deficient and that the deficient performance prejudiced the defense." *Hodges v. Colson*, 711 F.3d 589, 613 (6th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064-65 (1984)). To show deficiency, Petitioner must establish that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To show prejudice, Petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. Both components need not be addressed if Petitioner has failed to meet one of them. *Id.* at 697, 104 S. Ct. at 2069.

The Michigan Court of Appeals rejected the two allegations of ineffective assistance of counsel on the merits, reasoning as follows:

> As to the merits, it is well settled that to establish ineffective assistance of counsel, defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, (2) that there is a reasonable probability that but for counsel's error the result of the proceedings would have been different, and (3) that the attendant proceedings were fundamentally unfair or unreliable. *People v. Rodgers*, 248 Mich. App. 702, 714 (2001). Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion. *People v. Darden*, 230 Mich. App. 597, 605 (1998).
>
> Here, defendant first complains that his attorney should have moved to

-10-

suppress his statements to the police because they were coerced. When analyzing whether a statement was made voluntarily, a trial court must consider the totality of the circumstances, "including the duration of detention and questioning, the defendant's age, intelligence, education and experience, his physical and mental state, and the diverse pressures which sap or sustain his powers of resistance and self-control." *People v. Seymour*, 188 Mich. App. 480, 483 (1991). In this case, defendant complains that he had little sleep before being questioned, and that the police deceived him into believing the case was minor and could be easily resolved if he confessed.

Certainly, the fact that the police minimized the crime led to defendant's confession. That, after all, was the point of the tactic. However, a statement induced by a promise of leniency is not, per se, inadmissible. "Rather a promise of leniency is merely one factor to be considered in the evaluation of the voluntariness of a defendant's statements." *People v. Givans*, 227 Mich. App. 113, 119-120 (1997).

Looking to the other factors surrounding the interview, defendant was there voluntarily, it was not a particularly lengthy interview, the officers were not abusive, and defendant's answers did not suggest that he was confused because he was tired. While the officers' deception led to defendant's confession, and arguably undermined its credibility, we cannot say the deception rendered it involuntary. The authority cited by defendant in which statements were deemed involuntary involved facts more egregious, e.g., *People v. Richter*, 54 Mich. App. 598 (1974) (involving a threat of loss of parental rights). Looking at the totality of the circumstances here, including defendant's limited sleep and the officers' deception, we conclude that there is no reasonable chance that had defense counsel requested a *Walker* n6 hearing defendant's statements would have been suppressed. Because a motion to suppress defendant's statements would have likely failed, defense counsel was not ineffective for failing to make such a motion. Rather, defense counsel made a reasonable decision to simply argue to the jury that the officers' deception undermined the credibility of the confession.

n6 *People v. Walker* (On Rehearing), 374 Mich 331(1965).

Defense counsel's failure to object to the trial court's sua sponte suggestion that it had reviewed the voluntariness of the confession is more troubling. This Court has previously held that a court should not "inform the jury of the existence, nature, and results of a *Walker* hearing . . . ." *People v. Gilbert*, 55 Mich. App. 168, 173 (1974). This Court reasoned that doing so would make it difficult for a jury to find that the confession had not been made, and that it would "unfairly discount the credibility of defendant's impeaching evidence, especially that properly admitted evidence that relates to voluntariness. The trial court thus would improperly impinge upon the province of the jury." *Id.*

Here, the court seemed concerned that the attorneys' questions during voir dire regarding deception by the police might confuse the jury, so he wanted to instruct the jurors that some deception was permissible. Under *People v. Dudgeon*, 229 Mich. 26, 29 (1924), such an instruction would have been permissible. However, the court went further when it additionally stated that "if an admission comes in the court has to be satisfied that it was made knowingly, intelligently, and voluntarily." This instruction improperly impinged on the province of the jury to determine the voluntariness of defendant's confession. *Gilbert*, 55 Mich. App. at 173.

We disagree with the prosecutor that defense counsel might reasonably have decided not to object to the court's statement. The court clearly interrupted voir dire to impart the instruction. It was not a comment that might have slipped by the jury. Further, the court had not actually ruled on the admissibility of the statements, so the court's instruction was actually misleading. Objecting would have given defense counsel a chance to clarify for the jury that the court had not actually made a ruling on the voluntariness of the statement. This was an important point in a case that rested on whether the jury believed defense counsel's argument that defendant falsely confessed because of the police deception.

Thus, the question becomes whether there is a reasonable probability that but for defense counsel's failure to object to the court's instruction, the result of the proceedings would have been different. *Rodgers*, 248 Mich. App. at 714. We cannot conclude that it would have been, as the evidence against defendant was strong. Defendant was in the Check 'N

-12-

Go the day of the robbery and seemed to be scrutinizing the clerks'
actions. Defendant was wearing a similar sweatshirt and shoes to the
robber's. Defendant also matched the build and complexion of the
robber. Given this supporting evidence, it seems likely the jury would
have believed the confessional statements made by defendant to the
police even if the judge had not suggested that he had already concluded
that they were voluntarily made. Accordingly, defendant has failed to
establish ineffective assistance of counsel on this basis.

*Lewis*, 2011 Mich. App. LEXIS 353, at *9-14.

With respect to Petitioner's first habeas claim, the issue as framed by the

Michigan Court of Appeals amounted to a determination whether Petitioner's

statement to police would have been suppressed. If not, as the state court found, then

counsel was not ineffective for failing to challenge it. *See Bradley v. Birkett*, 192 F.

App'x 468, 475 (6th Cir. 2006) (counsel not ineffective for failing to object to

meritless prosecutorial misconduct claim).

In this action the issue is more subtle. Here, the Court must not merely

determine whether counsel was ineffective for failing to challenge the admissibility

of the statement, but whether the state court's rejection of the claim on the basis that

the statement was admissible resulted in an unreasonable application of clearly

established federal law. Habeas relief must be denied under this standard if

'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington*, 131 S. Ct. at 786.

Turning to the merits of the underlying suppression claim, when considering

the voluntariness of a confession, a court must consider the "totality of the circumstances" to determine whether a statement was the "product of an essentially free and unconstrained choice by its maker." *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S. Ct. 1246, 1251-52 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 2047 (1973). At one time, the Supreme Court held that a confession could not constitutionally be obtained by "any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897) (internal quotation marks omitted). As the Court found in *Fulminante*, however, "this passage from *Bram* . . . under current precedent does not state the standard for determining the voluntariness of a confession." *Fulminante*, 499 U.S. at 285, 111 S. Ct. at 1251.

The existence of a promise in connection with a confession does not render a confession per se involuntary. Rather, "[i]n determining whether a confession is involuntary due to police coercion, this Court has three requirements that must be met: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *United States v. Siler*, 526 F. App'x 573, 575 (6th Cir. 2013) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999)).

-14-

"[A] statement about possible leniency upon cooperation is not generally impermissible." *United States v. Cruse*, 59 F. App'x 72, 78 (6th Cir. 2003). In general, promises of leniency are coercive only "if they are broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262 n.1 (6th Cir. 2003). Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him. For example, promises of leniency that amount to a grant of immunity may render a confession invalid. *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993).

During Petitioner's trial, a recording of the police interview that resulted in his confession was played for the jury and transcribed. *See* ECF No. 8-4, pp. 242-312. At the start of the interview, Petitioner was informed that he was not under arrest and that he was free to leave. For the first portion of the interview, Petitioner flatly denied that he robbed the Check 'N Go. *Id.* at 242-270. Eventually, the questioning officer, Detective Smith, stated: "I know you made a mistake that day and I don't want you to make another one. I can make this go away." *Id.* at 271. Petitioner responded, "I didn't do it. I promise to God I didn't do it." *Id.* The officer stated, "I'm trying to minimize this for you." *Id.* Again, Petitioner denied involvement. *Id.*

The officer then changed tactics. He stated that "all Check 'N Go wants is their money back." *Id.* at 272. This tactic proved more effective, and Petitioner agreed to

pay restitution. After further discussion regarding the amount of restitution, interspersed with comments by the officer that he did not believe a serious offense occurred, Petitioner eventually disclosed the amount of money he obtained.

Throughout the rest of the interview, the officer focused on restitution, but also stated that he thought the crime was only a larceny, *id.* at 276, that it was a "one time deal," *id.* at 277, and that Petitioner would not be arrested. *Id.* at 278-279, 281. Then, towards the end of the interview, and after Petitioner had fully implicated himself, the officer stated that he would contact the prosecutor's officer to try to minimize the crime, but ultimately a decision on arresting Petitioner and charges would be up to the prosecutor. *Id.* at 289-291.

Another judge in this district has suggested that a promise by the police to make a potential criminal case "go away" could render involuntary a confession made after the promise:

> As the Sixth Circuit has observed, "a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). Yet, the Sixth Circuit has since clarified that "promises of leniency may be coercive" only if they are "broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003). There is no evidence of any broken or illusory promise here, where the agents, at most, offered only generalized "help" in any case that might subsequently be brought against Defendant, and did not promise to "make the case go away."

*United States v. Assi*, 512 F. Supp. 2d 1047, 1053 (E.D. Mich. 2007).

The officer here implied that if Petitioner paid restitution, he could make the case go away or minimize the charges faced by Petitioner. It was only after Petitioner finished incriminating himself that the officer informed him that any charges would be up to the prosecutor's officer and not him. It is therefore difficult to describe the questioning here as being anything other than objectively coercive. Tactics such as the ones used here are "problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely, and makes a promise, without authorization by the prosecution." *Siler*, 526 F. App'x at 575-76 (internal quotation marks and citation omitted). In *Siler*, the Sixth Circuit determined that a confession was coerced where the questioning officer represented to the defendant that he had the authority to decide on the charges that were brought, that cooperation would affect the decision, and the suspect repeatedly sought clarification on the value of his cooperation.  Here, too, the officer essentially made a promise of lenient treatment in exchange for restitution and an incriminating statement but,  as the officer himself later admitted, the promises were illusory because he had no authority to make them.

To succeed, however, Petitioner must also show that the coercive tactic was sufficient to overbear his will. *Siler*, 526 F. App'x at 575. Although, in this Court's view, the issue presents a very close question, the Court ultimately concludes that the

Michigan Court of Appeals reasonably found that the officer's tactics were not so coercive as to overbear Petitioner's will. As the state court correctly noted, Petitioner was not under arrest and was free to leave, it was not a particularly lengthy interview, the officers were not abusive, and Petitioner's answers did not suggest that he was confused or too tired despite having two-hours sleep at the time. These facts reasonably distinguish this case from cases like *Siler* where the suspect repeatedly referred to, and sought clarification regarding, the promises before incriminating himself. That is, the entirety of the circumstances of this interview left enough room for the Michigan Court of Appeals to find that Petitioner's will was not overborne by the coercive tactics of the questioning officer, and therefore find that Petitioner had not demonstrated that he was prejudiced by his counsel's failure to challenge the admissibility of the statement.

As stated, this Court believes that the underlying question as to the voluntariness of the confession presents a very close question. The question reasonably could be decided either way. That fact, however, cuts against Petitioner's claim for relief under § 2254(d). "If a state court's decision on a constitutional question is 'a close call,' that fact 'militates against the conclusion that the state court's application of the relevant Supreme Court precedent was objectively unreasonable.'" *Lovell v. Duffey*, 629 F. 3d 587, 598 (6th Cir. 2011) (quoting *Lopez*

*v. Wilson*, 426 F. 3d 339, 358 n.1 (6th Cir. 2005) (en banc) (Cole, J., concurring)).

Accordingly, Petitioner has not demonstrated entitlement to habeas relief with respect to his first claim of ineffective assistance of counsel.

Turning to Petitioner's second claim, the trial court instructed the jury that some deception by the police during an interrogation is permissible. The Michigan Court of Appeals found that, under state law, such an instruction was correct. *People v. Dudgeon*, 229 Mich. 26, 29 (1924). The trial court went on to further instruct the jury that "if an admission comes in, the court has to be satisfied that it was made knowingly, intelligently, and voluntarily." The Michigan Court of Appeals found that this portion of the instruction improperly impinged on the province of the jury to determine the voluntariness of defendant's confession. The state court also found that there was no conceivable strategic reason to fail to object to the instruction, so it went on to determine whether Petitioner could demonstrate that he was prejudiced by his counsel's deficient performance, and it found that he could not.

This Court concludes that the state appellate court's rejection of this claim on the prejudice prong of *Strickland* was reasonable. The state court noted that the evidence against Petitioner was strong. He was identified as being in the Check 'N Go on the day of the robbery and seemed to be scrutinizing the clerks' actions. During the robbery, the perpetrator was wearing a similar sweatshirt and shoes to

Petitioner's earlier attire, and he had a similar build and complexion. The court found that, given the evidence corroborating the confession, there was not a reasonable likelihood that the erroneous instruction altered the result of the trial. This decision constitutes a reasonable argument that Petitioner was not prejudiced, and therefore relief is barred under the AEDPA standard of review.

## B. Sentencing Claims

Petitioner's third claim asserts that his sentence of 15-to-20 years is invalid because the minimum term exceeds two-thirds of the maximum term. His fourth claim asserts that his Judgment of Sentence should be amended to indicate that he was not sentenced as a habitual offender. Neither claim is cognizable in this action.

It is well established that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991). Petitioner's challenge to his sentence only raises an issue under state law, which this Court cannot address in a habeas corpus proceeding. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 875 (1984).

Moreover, Petitioner has not demonstrated that his sentence is improper under state law. The relevant statute provides that a sentencing court "shall not impose a minimum sentence, including a departure, that exceeds 2/3 of the statutory maximum

sentence." Mich. Comp. Laws § 769.34(2)(b) (emphasis added). The statutory

maximum for armed robbery is life imprisonment. *See* Mich. Comp. Laws § 750.529.

Thus, Petitioner's minimum sentence of fifteen years does not violate the 2/3 rule. In

fact, the Michigan Supreme Court has ruled that § 769.34 does not apply when a

defendant is convicted of an offense punishable by a prison sentence of "life or any

term of years" because the minimum sentence will never exceed 2/3 of the statutory

maximum. *See People v. Harper*, 479 Mich. 599, 617 (2007) (citing *People v.

Drohan*, 475 Mich. 140, 162 n.14 (2006)). Because Petitioner was convicted of armed

robbery, an offense punishable by life or any term of years, the 2/3 rule is inapplicable

to his sentence.

Finally, as noted by the Michigan Court of Appeals, and as confirmed by the

copy of Petitioner's Judgment of Sentence filed with the Rule 5 materials, there is no

indication that Petitioner was sentenced as a habitual felony offender. Accordingly,

Petitioner's third and fourth habeas claims do not form a basis for granting relief.

## V.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability must

issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of

appealability may issue "only if the applicant has made a substantial showing of the

denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies

-21-

a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37, 123 S. Ct. at 1039.

The Court concludes that a certificate of appealability is warranted in this case because reasonable jurists could debate the Court's assessment of Petitioner's first claim relating to the effectiveness of Petitioner's counsel in failing to challenge the admissibility of his confession to police. The Court will deny a certificate of appealability with respect to Petitioner's remaining claims. The Court will also grant Petitioner permission to proceed on appeal in forma pauperis.

### VI.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED**

-22-

with respect to the claim relating to the effectiveness of Petitioner's counsel in failing to challenge the admissibility of his confession to police, but **DENIED** with respect to Petitioner's remaining claims.

**IT IS FURTHER ORDERED** that permission to proceed on appeal in forma pauperis is **GRANTED**.

s/Patrick J. Duggan
United States District Judge

Dated: February 26, 2015

Copies to:

Andrew N. Wise, Esq.
Jerrold E. Schrotenboer, Esq.
Laura Moody, Esq.

-23-